**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **DEEANN HORN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:14-CV-364 (MTT)** |
| | ) | |
| **CITY OF MACON**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Defendants Macon Police Department, Macon-Bibb County,[1] Officer William

Barron, Officer Jason Bray, and Officer Deborah Taylor have moved for summary

judgment on the claims that Plaintiff Deeann Horn has asserted against them.  (Doc.

28).  The motion is **GRANTED in part and DENIED in part**.

### I.      BACKGROUND

On October 13, 2012, Horn attended a concert at Central City Park in Macon,

Georgia with her ex-husband Kevin Horn, her then 12-year-old daughter, and her then

18-year-old daughter Jennifer.  (Docs. 28-1 ¶¶ 3, 7; 30 at 21:15-17, 26:7-8; 49-1 ¶¶ 3,

7).  Officers Bray, Taylor, and Barron, who worked for the Macon Police Department,

were hired by the concert promoters to assist security and enforce the law at the

concert.  (Docs. 28-1 ¶¶ 1-2; 49-1 ¶¶ 1-2).  According to Bray, the concert "was chaotic"

---

[1] Although the Plaintiff has also named the City of Macon as a Defendant, the City of Macon and Bibb
County have consolidated into Macon-Bibb County, as acknowledged by the Plaintiff.  (Doc. 1 ¶ 50).
Accordingly, the Court addresses the claims against the City as against the County, which, in any event,
are the same claims against the County.

with "anywhere between fifteen to twenty thousand people at this event." (Doc. 43 at 14:10-13).

Horn testified that by the time her family made their way to the stage, "a large crowd … had already amassed together …[,] shoulder-to-shoulder." (Doc. 30 at 26:16-18). Then, while watching the concert, "three young ladies [had] come up, and one of the young ladies … pushed [Horn] into the person in front of [her]," and Horn "pushed her back," after which they exchanged "heated words," including "bitch" and possibly "the F word." (Doc. 30 at 28:13-17, 29:19-30:21). Thereafter, two members of security approached Horn and told her to go with them, but she refused. (Doc. 30 at 34:16-23, 35:16-36:1).

According to Bray and Taylor, security informed them that Horn had pushed and punched another female and that Horn was refusing to leave. (Docs. 43 at 6:13-15, 9:4-8, 12:17-13:5; 44 at 11:7-15). Horn acknowledged that Bray and Taylor were aware a physical altercation had occurred. (Doc. 30 at 62:20-63:2). Bray and Taylor testified that Horn also refused to leave with them and said "I didn't do any fucking thing. This is bullshit" and then twice said "[t]his is fucking bullshit. I'm not going anywhere." (Docs. 43 at 15:8-15, 26:3-11; 44 at 17:7-10). Bray further described Horn as being uncooperative and "very belligerent," and Taylor also said Horn was "loud and belligerent" and "acting a fool." (Docs. 8-1 ¶ 13; 8-2 ¶ 12; 44 at 38:18-22; 45-1 at 16). Bray stated that while Horn was using profanity, there were "several young—young kids" and "several adults" around, and that "maybe" three kids were under the age of fourteen. (Doc. 43 at 16:16-20, 17:19-18:3). Taylor testified that "probably two or three" children under the age of 12 were around. (Doc. 44 at 25:24-26:1). Kevin Horn testified

that "[t]here were men, women, children around … [o]f all ages and types," and Horn testified that children were around.  (Docs. 30 at 31:10-12; 31 at 23:20-24).

While Bray escorted Horn out of the crowd, Taylor, who walked behind them, said Horn consistently pulled her arm away from Bray.  (Docs. 43 at 72:3-4; 44 at 17:20-24, 23:9-24:7).  Horn denied that she resisted and testified that Bray "dragg[ed her] through the crowd."  (Doc. 30 at 37:25-38:6, 44:6-25).  When they reached the gate, Bray and Taylor "slung [her] out," according to Horn.  (Doc. 30 at 38:25-39:2).  Horn stayed at the exit to learn why she was being thrown out.  (Doc. 30 at 42:11-17).

Bray testified that he intended to "write her a citation for disorderly conduct" because she used "profane language in front of the kids under fourteen years of age." (Doc. 43 at 21:10-15, 21:24-25:1, 26:3-8).  However, before writing the citation, Bray dealt with a patron who had poured beer down his shirt as he removed Horn from the concert.  (Docs. 43 at 27:3-16; 45 at 27:2-5).  Barron, who was not involved in escorting Horn, was already near the gate and stayed to watch Horn because he "wasn't sure if [Bray] was … finished with her."  (Doc. 45 at 29:10-18, 30:2-5).

As Bray and Taylor were escorting Horn from the concert, two women approached Barron and told him they had been assaulted.[2]  (Doc. 45 at 59:6-18-61:24, 80:2-13, 84:16-19; 45-1 at 9).  One said she had been grabbed around the throat and choked.  (Doc. 45 at 80:11-13, 84:16-19).  The other "had a bloody nose and [what]

---

[2] Barron's account of the witnesses' statements was first memorialized in a December 12, 2012 statement taken by Internal Affairs.  The statement was played during Barron's deposition and transcribed as a part of the deposition, and Barron confirmed the accuracy of the statement.  (Doc. 45 at 78:21-84:19).  Horn does not object to the Court's consideration of the victims' statements, though she does call their statements hearsay in her response to the Defendants' statement of undisputed material facts.  (Doc. 49-1 ¶¶ 34-36).  However, these statements are offered to demonstrate what Barron knew at the time he arrested Horn, not to prove the truth of the matter asserted.  *See Trujillo v. Fla. Agency for Health Care Admin.*, 405 F. App'x 461, 464 (11th Cir. 2010) ("The affidavit is not hearsay; it is not offered to prove the facts stated therein but is offered to show what [the defendant] knew when he submitted the probable cause affidavit.").

looked like some contusions." (Doc. 45 at 80:2-7, 84:16-19). The women explained that this altercation came about "because they were breaking in line, getting closer to the stage [] than the suspect was, and that made [the assailant] mad." (Doc. 45 at 80:13-16, 84:16-19). The women identified Horn as the assailant.[3] (Doc. 45 at 80:17-22, 84:16-19).

Horn testified that while she was at the gate, she was upset that no one ever asked her what happened or explained why she "had been drug out of a concert." (Doc. 30 at 39:3-11). Barron said that Horn, who was 10 feet away from him, "was telling [him] to 'fuck off' and 'fuck you' and 'I didn't do a fucking thing" and pointing her finger at him. (Doc. 45 at 26:25-27:1, 30:19-21, 31:11-12, 81:6-11). He also testified that he "didn't know if [Horn] was going to attack [him] when she started throwing the profanities out at [him]" and "walk[ing] toward [him]." (Docs. 8-3 ¶ 16; 45 at 82:21-23, 86:25-87:1). Horn admits that while she cannot remember every word she said, she did use profanity and said "don't y'all want to know what f'ing happened" and "f-u, F this, F that" but stated that she was "25, 30" feet away from Barron. (Doc. 30 at 40:10-20, 41:14-20, 67:15-16). Taylor was also in the area but testified that she did not recall hearing Horn use any profanity while she was yelling from the gate. (Docs. 30 at 40:25-41:4; 44 at 71:12-14).

There is conflicting evidence about whether people in the general public were nearby as Horn shouted profanity after she had been escorted out. Horn testified that Kevin Horn and her 12-year-old daughter were present. (Doc. 30 at 41:14-42:1, 42:20-43:1). While Barron testified by affidavit that Horn "loudly yell[ed] profanity in the

---

[3] Officer Barron only knew about Horn's alleged physical altercation because these two women told him about it. He did not speak with Bray and Taylor about why they were escorting Horn from the crowd before he arrested her. (Doc. 45 at 29:10-18, 30:2-5).

presence of minors and the general public," he admitted in his deposition that he did not hear her use profanity in the presence of a child under 14 and could not identify any children between them.  (Docs. 8-3 ¶ 17; 45 at 31:23-32:4, 72:25-73:2).  He also stated that he could not identify "any other persons … in the area when [Horn] was standing there," that no one was between them, and that he did not see her ex-husband or her 12-year-old daughter.  (Doc. 45 at 31:18-22, 32:5-12).  He gave no other description about the people around them.

In the Internal Affairs interview, Barron stated that as a result of her cussing and pointing at him, he "went and placed … Horn into custody for disorderly conduct [and] grabbed her left arm."  (Docs. 45 at 81:12-14, 84:3-5; 45-1 at 10).  Barron testified he was initially unable to place her in handcuffs because "[s]he jerked away and started walking away from [him]," and she got 14-15 feet away from him before he was able to grab her arm again and take her to the ground.  (Doc. 45 at 35:14-20, 36:17-25).  Taylor told Internal Affairs that she saw Horn "actively resisting" Barron and testified that she saw Horn "intentionally br[eak] out of his hold so she could walk in the opposite direction."  (Docs. 44 at 39:5-13, 47 at 8-14; 45-1 at 17).  Also, Horn's older daughter said in an Internal Affairs interview that Horn "snatched back or moved back from him" when Barron "put his hands on" Horn, and her 12-year-old daughter said Horn "hit back" after Barron "put his hands on" her and "kind of pushed her."  (Doc. 32 at 12, 15).

Horn denied that she resisted Barron or pulled away; rather, "when he grabbed [her] arm, [she] pulled toward [herself], asking him why he was putting his hands on [her]."  (Doc. 30 at 43:16-44:1, 64:11-17).  Then, according to Horn, "when he grabbed [her] by [her] left arm again, [she] was thrown on the ground" and "hit the ground …

[v]ery hard." (Doc. 30 at 43:9-13, 45:4-5). She stated that she "literally bounced off the pavement and hit the pavement again." (Doc. 30 at 49:2-3). Horn testified that her arm broke as a result of being thrown to the ground, and she later received surgery. (Docs. 28-1 ¶ 67; 30 at 45:12-14; 49-1 ¶ 67).

Seeing Horn being taken to the ground, Kevin Horn got on Barron's back. (Docs. 32 at 45:17-46:4; 43 at 30:12-14, 31:20-24; 44 at 39:20-22). Bray and Taylor were able to apprehend Kevin, and then Barron handcuffed Horn in front of her body because she said her arm was dislocated. (Docs. 30 at 63:7-11; 43 at 35:18; 44 at 60:12-19; 45 at 66:18-67:1 81:19-22; 49-1 ¶¶ 59-60). Bray wrote a disorderly conduct citation for Horn, and then he and Taylor escorted her to jail. (Docs. 43 at 37:2-8; 45 at 56:11-22). Later that night, Barron wrote another disorderly conduct citation for Horn. (Docs. 28-1 ¶ 62; 49-1 ¶ 62).

The evidence is inconsistent as to whether Horn's use of profanity was the only basis for Horn's arrest or whether the physical altercation in the crowd also factored into the Defendants' decision to arrest her. In his affidavit, Barron stated that Horn was arrested for assaulting the two females, but then testified in his deposition that Horn had not done anything else that was a criminal offense, that he only arrested her because she directed profanity at him, and that the two citations were for the profanity towards him and her profanity around children under 14. (Docs. 8-3 ¶ 25; 45 at 38:1-5, 87:21-24, 70:3-22, 72:15-24). Taylor also stated in her affidavit that Horn was arrested because of her "verbal and physical assault" of a concert attendee in addition to her "use of profanity by yelling in a large crowd that included minor children." (Doc. 8-2 ¶ 17). However, Bray testified that Horn's use of profanity around children under 14 was

the only reason he wrote the citations.  (Docs. 43 at 21:12-22:1, 51:11-19, 37:2-11, 74:7-9, 83:8-11).

On October 10, 2014, Horn filed this lawsuit, asserting federal claims pursuant to 42 U.S.C. § 1983 for failure to train and supervise against the Macon Police Department and Macon-Bibb County and for unlawful arrest in violation of the Fourth Amendment, First Amendment retaliation, and excessive force in violation of the Fourth Amendment against Bray, Taylor, and Barron; and state-law claims for negligent hiring, training, supervision, and retention against the Macon Police Department and Macon-Bibb County and for false arrest, false imprisonment, assault, and battery against Bray, Taylor, and Barron.[4]  (Doc. 1).

## II.      DISCUSSION

### A.      Motion for Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

---

[4] The Court notes that after this lawsuit was filed, a jury found Horn not guilty of two counts of disorderly conduct.  (Docs. 30 at 85:19-25; 45 at 72:4-13).

the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact.  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

**B.       Qualified Immunity Standard**

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   "'Once discretionary authority is established, the burden then shifts to Horn to show that qualified immunity should not apply.'" *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).   To meet this burden, a plaintiff must establish that "the 's conduct amounted to a constitutional violation" and "the right violated was 'clearly established' at the time of the violation." *City of W. Palm Beach*, 561 F.3d at 1291.   This two-step analysis may be done in whatever order is deemed most appropriate for the case. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The clearly established law[5] must provide a defendant with "fair warning" that his conduct deprived the plaintiff of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002).   A plaintiff "can demonstrate that the contours of the right were clearly established in several ways." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). First, a plaintiff can show that "a materially similar case has already been decided." *Id.* (internal quotation marks and citations omitted).   Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the]

---

[5] Clearly established law in this circuit means decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

situation." *Id.* (internal quotation marks and citation omitted). "Finally, the conduct involved in the case may 'so obviously violate[ ] th[e] constitution that prior case law is unnecessary.'" *Id.* (citation omitted). "[E]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

For the unlawful arrest claims, the qualified immunity analysis is somewhat different than the traditional two-step analysis. The Court addresses qualified immunity for the unlawful arrest claims below.

**C.   Macon Police Department**

The Defendants have moved for summary judgment on the claims against the Macon Police Department because they contend it is not a legal entity capable of being sued. (Doc. 28-2 at 10). Horn does not directly respond to this argument, though she does continue to argue that the Macon Police Department is liable. Nevertheless, it is clear under Georgia law that the Macon Police Department is not a legal entity capable of being sued. *See Lovelace v. Dekalb Cent. Prob.*, 144 F. App'x 793, 795 (11th Cir. 2005); *Green v. Georgia*, 2013 WL 2667670, at *2 (M.D. Ga.); *Bunyon v. Burke Cty.*, 285 F. Supp. 2d 1310, 1328 (S.D. Ga. 2003) (citing *Ga. Insurers Insolvency Pool v. Elbert Cty.*, 258 Ga. 317, 368 S.E.2d 500, 502 (1988) and *Shelby v. City Atlanta*, 578 F. Supp. 1368, 1370 (N.D. Ga. 1984)), *aff'd* 116 F. App'x 249 (11th Cir. 2004). Accordingly, the Macon Police Department is dismissed as a Defendant.

D.   *Monell* **Liability**

Horn contends that *Monell*[6] liability attaches to Macon-Bibb County because (1) the Defendants could not recall when they had excessive force training and (2) "[t]he policy of allowing officers to work through the department for direct cash payments is clearly the moving force behind defendants' violation of [her] rights." (Doc. 49 at 26). The Supreme Court has placed strict limitations on municipal liability under § 1983. *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). "A county's liability under § 1983 may not be based on the doctrine of respondeat superior." *Id.* Instead, only when the county's policy causes a constitutional violation may a county be held responsible. *Monell*, 436 U.S. at 694. Further, a municipality can be held liable where a "policy or custom" of inadequate training or supervision "evidences a 'deliberate indifference' to the rights of its inhabitants." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citation omitted).

As to *Monell* liability based on the use of excessive force, Horn appears to only rely on an inadequate training theory. (Doc. 49 at 26). Macon-Bibb County provided evidence that officers are trained annually on "all aspects" of the use of reasonable force. (Doc. 45 at 99:21-101:6). Horn rests her argument solely on the Defendants' alleged testimony that they could not recall their last training.[7] (Doc. 49 at 26). This is insufficient to establish *Monell* liability; no reasonable jury could conclude from this

---

[6] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[7] Specifically, Horn's one sentence argument is: "The officers were last provided training with regard to excessive force so long before the incident involving [Horn] that they could not recall when." (Doc. 49 at 26). Horn does not cite to the record to support this assertion, and the Court can find nothing in the record that supports it. Although the examination of Bray and Taylor on the subject is confusing, it appears that at most they testified simply that they did not recall all the training they had received. Barron testified, consistent with the County's policy, that he received use of force training annually, although he could not recall exactly when. (Doc. 45 at 99:21-100:22).

evidence alone that Macon-Bibb County was on actual or constructive notice of a deficiency in training that resulted in constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."); *Gold*, 151 F.3d at 1351 ("[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.").

With regard to the policy allowing officers to work for private employers, Horn must establish that this facially constitutional policy[8] was "taken with 'deliberate indifference' as to its known or obvious consequences." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (internal quotation marks and citation omitted). With a facially constitutional policy, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 415 (1997).

Macon-Bibb County has provided evidence of its policy that allows "[o]nly sworn police officers … to arrest or execute arrest warrants" and that explains when an arrest may be executed without a warrant. (Doc. 45-2 at 57-58). Thus, Macon-Bibb County argues that its officers are adequately trained with regard to the proper grounds for an arrest. Macon-Bibb County also relies on the absence of any evidence showing a custom or policy that was the moving force behind the alleged constitutional violations.

---

[8] Horn does not argue the policy is facially unconstitutional. Nor could she. It is required that "no set of circumstances exists under which the Act would be valid" for a policy to be facially unconstitutional. *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is certainly not the case here.

(Doc. 28-2 at 12).  *See Four Parcels of Real Prop.*, 941 F.2d at 1437-38 ("[T]he moving

party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an

absence of evidence to support the nonmoving party's case.'" (second and third

alterations in original) (citation omitted)).

Horn simply counters that it is "clear[]" the policy of allowing officers to work for

private employers through the department for cash was the moving force behind the

alleged constitutional violations because "[w]hen police officers are allowed to sell their

badges to permit private employers to engage in conduct that the private security

officers could not, namely effect arrest, such a policy is the moving force behind much

abuse."  (Doc. 49 at 26).  Horn's unsupported, conclusory accusation does not at all

establish Macon-Bibb County's policy caused the constitutional violations she has

alleged.  *See McDowell*, 392 F.3d at 1291-92 (stating that whether a policy is the

"moving force" behind a constitutional violation is a question of causation and that

deliberate indifference is the appropriate culpability standard).  Further, Horn does not

point to any evidence, beyond her own incident, demonstrating Macon-Bibb County's

deliberate indifference.  For example, she does not provide evidence of the "much

abuse" that has, purportedly, occurred from this policy.  It is well-established that

"[p]roof of a single incident of unconstitutional activity," which is all that has been

presented here, "is not sufficient to impose liability against a municipality."[9]  *Craig v.*

*Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citation omitted); *Gold*, 151 F.3d

at 1351.  Finally, the Court, after its own review of the record, sees no evidence from

---

[9] The Court acknowledges that in *Canton v. Harris*, the Supreme Court left open the possibility that the
need for training or supervision in certain areas could be "so obvious" that a pattern of previous
constitutional violations would not be required.  489 U.S. 378, 390 (1989).  To the extent Horn relies on
such a theory, the policy at issue or any purportedly inadequate training "falls far short of the kind of
'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on
the part of [Macon-Bibb County]."  *Id.* at 396-97.

which a reasonable jury could conclude that Macon-Bibb County was deliberately indifferent.

Accordingly, Macon-Bibb County is entitled to summary judgment on Horn's § 1983 claim against it.

## E.  Fourth Amendment Claims for Unlawful Arrest

"Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures' .... [, and] an arrest is a seizure of the person." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  "The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause."  *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (citing *Skop*, 485 F.3d at 1137).  "The 'existence of probable cause at the time of arrest constitutes an absolute bar to a [S]ection 1983 action for false arrest.'"  *Rushing v. Parker*, 599 F.3d 1263, 1265 (11th Cir. 2010) (quoting *Case*, 555 F.3d at 1367-27).

However, it is not necessary to address probable cause.  Bray, Taylor, and Barron are entitled to qualified immunity if they had arguable probable cause to arrest Horn.[10]  *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004).  Arguable probable cause exists when "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff."  *Id.* (internal quotation marks and citation omitted). "Whether an officer possesses … arguable probable cause depends on the elements of

---

[10] As discussed, to be eligible for qualified immunity, the government official "must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citation omitted).  Horn does not dispute that the Defendants were engaged in a discretionary function at the time of the arrest.  In any event, the Court concludes that they were in fact engaged in a discretionary function, as making an arrest is a discretionary function, and is certainly an act of "'a type that [falls] within the employee's job responsibilities.'"  *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)).

the alleged crime and the operative fact pattern." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010).  However, "[s]howing arguable probable cause does not … require proving every element of a crime."  *Id.*  Further, "[i]f the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply."  *Id.*  "The standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs."  *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010).

Bray, Taylor, and Barron arrested Horn pursuant to Georgia's disorderly conduct statute which provides that a person commits the offense of disorderly conduct when the person:

> (1) Acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health;
> (2) Acts in a violent or tumultuous manner toward another person whereby the property of such person is placed in danger of being damaged or destroyed;
> (3) Without provocation, uses to or of another person in such other person's presence, opprobrious or abusive words which by their very utterance tend to incite to an immediate breach of the peace, that is to say, words which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called "fighting words"; or
> (4) Without provocation, uses obscene and vulgar or profane language in the presence of or by telephone to a person under the age of 14 years which threatens an immediate breach of the peace.

O.C.G.A. § 16-11-39(a).

Under Georgia law, an arrest for disorderly conduct based on speech "requires a face-to-face confrontation or the presence of a crowd." *Merenda v. Tabor*, 506 F. App'x 862, 866 (11th Cir. 2013) (collecting cases). Further, the speech, regardless if it is used in the presence of children under 14, must amount to fighting words. *In re L.E.N.*, 299 Ga. App. 133, 135, 682 S.E.2d 156, 158 (2009) (citation omitted). Fighting words are those words "'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Id.* at 134, 682 S.E.2d at 157 (internal quotation marks, footnote, and citation omitted). Georgia law also requires that courts "examine not only the words used but also the circumstances and context in which they were said." *Id.* at 135, 682 S.E.2d at 158.

Although the parties acknowledge that the determination of arguable probable cause turns on whether reasonable officers could have believed that probable cause existed to arrest Horn for *any* offense, they dwell entirely on the Defendants' subjective reasons for Horn's arrest and the crimes the Defendants believed Horn committed.[11] For example, Barron strains, unsuccessfully, to demonstrate that he had arguable probable cause to arrest Horn for her vulgar profanity.[12] The question, however, is

---

[11] The Court convened a telephone conference to give the parties an opportunity to address this issue further. (Doc. 51).

[12] There are clearly genuine issues of material fact regarding whether Barron had arguable probable cause to arrest Horn for her use of profanity. As discussed, Georgia law requires either a face-to-face confrontation or the presence of a crowd if an arrest for disorderly conduct is based on speech. *Merenda*, 506 F. App'x at 866. There is evidence that this was not a face-to-face confrontation: Horn was "25, 30" feet away, and Barron admitted she was not within "striking distance." (Docs. 30 at 41:14-20; 45 at 31:13-15, 86:25-87:1). Further, there is a genuine issue of fact whether a crowd was present. Horn was outside the gate away from the crowd that she was previously in with Bray and Taylor, and Horn testified that only her husband and younger daughter were present. (Doc. 30 at 42:20-43:1). Barron generally stated in his affidavit that minors were present and that she used profanity in the "general public," but he admitted in his deposition that he could not identify "any other persons … in the area when [Horn] was standing there," that no one was within the range between them, and that he did not see her husband or her 12-year-old daughter. (Docs. 8-3 ¶ 17; 45 at 31:18-22, 32:5-12).

whether reasonable officers knowing the facts known to Bray, Taylor, and Barron could have believed they had probable cause to arrest Horn for any criminal offense.  The answer is yes.

Bray and Taylor had arguable probable to arrest pursuant to O.C.G.A. § 16-11-39(a)(3) and (4).[13]  The facts here, construed in the light most favorable to Horn, demonstrate beyond dispute that Bray and Taylor had been told Horn had fought with other concert attendees,[14] had refused security's instruction to leave, and then told Bray and Taylor that "I didn't do any fucking thing" and then twice stated "[t]his is fucking bullshit. I'm not going anywhere."[15]  (Docs. 43 at 15:8-15, 21:10-15, 21:24-25:1, 26:3-11; 44 at 17:7-10).  Significantly, she used this profanity in the middle of a large, "shoulder-to-shoulder" crowd with "bystanders who could be provoked."[16]  (Docs. 30 at

---

[13] As noted by the Defendants (Doc. 28-2 at 16), it does not appear that Taylor actually arrested Horn, but assuming that she did for purposes of this motion, the Court applies the same reasoning to both Defendants.

[14] In her deposition, Horn also acknowledged that Bray and Taylor had been told about her physical altercation.  (Doc. 30 at 59:15-60:7, 62:20-63:15).  Horn calls security's statements hearsay in her response to the Defendants' statement of undisputed material facts.  (Doc. 49-1 ¶¶ 20-21).  But, again, she does not object to the Court's considerations of these statements, and the statements are offered to prove the Defendants' knowledge, not the truth of the matter asserted.

[15] The Court notes that when asked whether she told Bray that she was not going "f'ing" anywhere after they approached her in the crowd, Horn testified, "I don't recall that.  I could have."  (Doc. 30 at 79:2-4).  In her response to the motion for summary judgment, Horn does not deny that she used this profanity and even concedes that she "probably used profanity including the 'F' word."  (Doc. 49 at 3).  Either way, Horn's testimony that she did not recall using this profanity does not by itself create a genuine issue of fact whether she used this profanity.  *See, e.g., Dickey v. Baptist Mem'l Hosp.*, 146 F.3d 262, 266 n.1 (5th Cir. 1998) ("The mere fact that [the deponent] does not remember the alleged phone conversation … is not enough, by itself, to create a genuine issue of material fact [as to whether the conversation occurred].");  *Hartford Cas. Ins. Co. v. Jenkins*, 2010 WL 2348619, at *1 n.1 (S.D. Ala.) (collecting cases and stating "[c]ourts routinely hold that a party's lack of recollection cannot create a genuine issue of material fact in such circumstances").

[16] Although the Defendants did not elicit testimony regarding how Horn was positioned in relation to Bray and Taylor, under the facts, it is also difficult to see how this was not a face-to-face confrontation.  Again, Horn testified that they were in a "shoulder-to-shoulder" crowd and that Bray grabbed Horn to get her out of the crowd.  (Docs. 30 at 26:16-18, 31:4-13; 43 at 16:16-20).  Thus, there was likely a very close proximity between Horn and the Defendants.  Notably, while Horn argues she was not in a face-to-face

31:4-13; 31 at 23:20-24); *Merenda*, 506 F. App'x at 866.  Further, reasonable officers could have believed that Horn was not simply using profanity "to emphasize [a] statement" but also to voice her resistance to their authority and their directive to leave, and she did so in the same crowd where she had assaulted someone.  *In re L.E.N.*, 299 Ga. App. at 135, 682 S.E.2d at 158; *see also Roberts v. City of Hapeville*, 2007 WL 521901, at *5 (N.D. Ga.) (concluding the defendant had arguable probable cause to arrest the plaintiff for disorderly conduct where he was "argumentative, uncooperative and attempted to involve other patrons when he was asked to quiet down").  Thus, a reasonable officer could have believed that Horn's profanity tended to provoke an immediate breach of the peace.  *See Johnson v. State*, 255 Ga. App. 537, 537, 566 S.E.2d 349, 350 (2002) (upholding a conviction under the disorderly conduct statute where the defendant yelled "f--- the police" repeatedly in a crowd "within hearing distance of numerous small children").  Therefore, given the nature of her profanity and the presence of the large crowd, reasonable officers in Bray's and Taylor's positions could have believed they had probable cause to arrest Horn for disorderly conduct for her use of fighting words.[17]

Further, Bray, Taylor, *and* Barron had arguable probable cause to arrest Horn because she acted "in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health."  O.C.G.A § 16-11-39(a)(1).  Again, it is undisputed security told Bray and Taylor

---

confrontation with Barron, she does not make the same argument with respect to Bray and Taylor.  (Doc. 49 at 17).

[17] Horn argues that there was no arguable probable cause to arrest because she was provoked.  But this argument is unavailing.  (Doc. 49 at 18).  Even assuming a reasonable jury could conclude that she was provoked, "[a]rguable probable cause does not require an arresting officer to prove every element of a crime."  *Scarbrough v. Myles*, 245 F.3d 1299, 1302-1303 (11th Cir. 2001).

that Horn had punched and pushed another female. (Docs. 43 at 6:13-15, 9:4-8, 12:17-13:5; 44 at 11:7-15). Barron testified that before he arrested Horn, two of her alleged victims, one with a visibly bloody nose and contusions, told him that Horn had assaulted them.[18] (Doc. 45 at 80:2-16, 84:16-19). Therefore, reasonable officers in the same position as Bray, Taylor, and Barron and with their same knowledge, could have believed probable cause existed to arrest Horn for disorderly conduct pursuant to O.C.G.A § 16-11-39(a)(1).[19] *See Mayhew v. State*, 299 Ga. App. 313, 316, 682 S.E.2d 594, 597 (2009) (upholding a disorderly conduct conviction under O.C.G.A § 16-11-39(a)(1) where the defendant got in a person's face, called her a bitch and a whore, asked her who she was sleeping with, and accused her of forging signatures).

Accordingly, because they had arguable probable cause to arrest Horn, Bray, Taylor, and Barron are entitled to qualified immunity for Horn's § 1983 unlawful arrest claims.

## F.   First Amendment Retaliation Claims

Because Bray, Taylor, and Barron had arguable probable cause to arrest Horn, they are also entitled to qualified immunity for Horn's First Amendment retaliation claim against them. *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be

---

[18] Horn argues that it is not undisputed that Barron learned of the assault before he arrested her because Horn's daughter told Internal Affairs that one of the victims said Horn was the assailant *after* Barron threw Horn to the ground. (Doc. 32 at 15-16). However, that one of the girls was present after Barron's arrest does not preclude the fact that Barron was told by both victims that Horn was the assailant *before* he arrested her.

[19] Given the information the Defendants had regarding Horn's physical altercation, they also had arguable probable cause to arrest her for simple assault and/or simple battery. O.C.G.A. § 16-5-20 (simple assault); O.C.G.A. § 16-5-23 (simple battery). Again, the question is whether the Defendants had arguable probable cause to arrest Horn for *any* criminal offense. *Brown*, 608 F.3d at 735.

speaking at the time that he is arrested."); *Merenda*, 506 F. App'x at 867 n.5 (citing the same).

## G.     Fourth Amendment Claim for Excessive Force

Horn has asserted Fourth Amendment excessive force claims against Barron, Bray, and Taylor based on Bray's and Taylor's conduct while escorting Horn out of the crowd and Barron's throwing Horn to the ground.  (Docs. 1 ¶¶ 14, 44-48; 49 at 24).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).  "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989). Excessive force claims are judged under the "objective reasonableness standard." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015).  The determination whether an officer exercised a reasonable degree of force in making an arrest "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.  Factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  The Eleventh Circuit also considers "'the need for the application of force, … the relationship between the need and amount of force used, and … the extent of the injury inflicted.'"  *Mobley*, 783 F.3d at 1353 (omissions in original) (quoting *Lee*, 284 F.3d at 1198).  Courts are also to keep in mind that "[o]fficers facing disturbances 'are

often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (quoting *Graham*, 490 U.S. at 397).

### 1. Whether Horn has established a constitutional violation against Bray and Taylor

With regard to Bray and Taylor, Horn bases her excessive force claims on their conduct while escorting her out of the crowd. (Doc. 49 at 24). She says she was non-resistant to their efforts to arrest her. (*Id.*). Again, the Supreme Court has stated that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Therefore, the use of any force on a compliant arrestee does not, by itself, establish an excessive force claim. Indeed, the "[a]pplication of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

Here, it is apparent that Bray and Taylor's use of force was de minimis. With respect to Taylor, there is no evidence that she ever used any force as Bray escorted Horn out of the crowd. Horn testified that Taylor walked behind her and Bray. (Doc. 30 at 37:25-38:1). At most, she and Bray "slung" or pushed Horn out of the concert when they reached the gate. (Docs. 30 at 42:2-3, 80:24-24; 32 at 15). But without further description of the severity of the push or any evidence of any injury from it, this push was clearly de minimis force. *See Hamilton v. City of Jackson, Ala.*, 261 F. App'x 182, 186 (11th Cir. 2008) (explaining that the Eleventh Circuit has determined that "pushing a handcuffed arrestee up against a wall because the arrestee spoke after being told to 'shut up'; slamming a suspect against a wall … without provocation; and grabbing an

arrestee from behind, shoving him a few feet against a vehicle, and pushing him up against a van, which resulted in minor bruising" amounted to de minimis force (citations omitted)).  With respect to Bray, the evidence, construed in the light most favorable to Horn, shows that he grabbed her arm and pulled her very quickly through the crowd. (Docs. 30 at 37:22-38:21; 31 at 26:18-20, 27:23-24).  Although Horn testified that she was "dragged" through the crowd, she admits she was able to be "on [her] feet" during the escort.  (Doc. 30 at 38:18-39:2).  Thus, no reasonable jury could find that Horn was literally dragged through the crowd.  Therefore, under Eleventh Circuit precedent, it is clear that simply grabbing Horn's arm and pulling her through the crowd are de minimis uses of force.  *See Hamilton*, 261 F. App'x at 186 (collecting cases where comparable uses of force to Bray's were held to be de minimis).  Accordingly, Bray and Taylor are entitled to summary judgment on Horn's § 1983 excessive force claims against them.[20]

### 2.  Whether Horn has established a constitutional violation against Barron

With regard to Barron, the evidence in this case presents two contradictory versions of what happened.  In Barron's version, Horn resisted his efforts to seize her. He testified that when he grabbed her arm to arrest her, "[s]he jerked away and started walking away from [him]," and she got 14-15 feet away from him before he was able to grab her arm again and take her to the ground.  (Doc. 45 at 35:14-20, 36:17-25).  Taylor told Internal Affairs that she saw Horn "actively resisting" Barron, and she testified that she saw Horn "intentionally br[eak] out of his hold so she could walk in the opposite

---

[20] Because Horn has failed to establish a constitutional violation, the Court need not address the clearly established law step of the qualified immunity analysis.  Nevertheless, the Court adds that Horn failed to provide any case law establishing that an officer's grabbing an arrestee's arm and pulling her out of a crowd to effectuate the arrest and then pushing her amounted to excessive force.  Rather, again, the law is clearly established that the use of de minimis force such as this does not violate an arrestee's Fourth Amendment rights, regardless if the arrestee was compliant.  *Nolin*, 207 F.3d at 1257; *Hamilton*, 261 F. App'x at 186.

direction." (Docs. 44 at 39:5-13, 47 at 8-14; 45-1 at 17). Also, Horn's 18-year old daughter stated in an interview that Horn "snatched back or moved back from him" when Barron "put his hands on" Horn, and her 12-year old daughter stated Horn "hit back" after Barron "put his hands on" her. (Doc. 32 at 12, 15). Thus, this evidence, if credited, establishes that she was actively resisting arrest and attempting to flee and that there was a need for force beyond that which is ordinarily necessary to effectuate the arrest of a compliant individual. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (concluding an officer's use of a Taser against a suspect at a traffic stop was appropriate when suspect "used profanity, moved around and paced in agitation, ... repeatedly yelled at" the officer, and was noncompliant with verbal commands).

But in Horn's version of events, the majority of the factors weigh in her favor. With respect to the severity of her crime, it is undisputed Barron arrested Horn for a non-serious offense. *See Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) ("Disorderly conduct is not a serious offense."). Further, Horn testified that she was "totally compliant," denied that she ever resisted Barron, and denied her daughters' version of events. (Doc. 30 at 43:25-44:1, 64:7-17, 66:20-68:13). Thus, according to her, she was not actively resisting arrest or attempting to flee, and there was no need for force beyond that which is ordinarily necessary to effectuate the arrest of a compliant individual. *See Fils*, 647 F.3d at 1289 ("[N]on-violent suspects, accused of minor crimes, who have not resisted arrest … are victims of constitutional abuse when police used extreme force to subdue them."); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-21 (11th Cir. 2008) ("[The plaintiff] neither resisted arrest nor posed a danger to [the defendant] sufficient to warrant a blow to the stomach.").

At most, in her version, Horn simply pulled her arm towards herself in response to Barron's touch, but this reaction alone would not "justify a greater use of force."  *See Fils*, 647 F.3d at 1288 (holding that the use of a Taser was excessive where the plaintiff took one step back away from the officer and did not resist arrest or disobey any directives).  Her testimony is not, for example, that she pulled her arm out of Barron's grip in resistance to his efforts to handcuff her.  *But see Popham v. City of Kennesaw*, 820 F.2d 1570, 1576 (1987) (concluding a reasonable jury could have found that the "need to initiate force was minimal" when a plaintiff refused to leave with the defendants and pulled arm out of a defendant's grip).  Nevertheless, Barron threw Horn to the ground so hard that her arm broke.  (Docs. 28-1 ¶ 67; 49-1 ¶ 67).  Given these facts, if credited, a reasonable jury could find that Horn's crime was not severe, she was not resisting arrest or attempting to flee, the amount of force from the takedown would be disproportionate to the lack of need for such force, and the use of force caused severe injury.

Clearly, the parties' testimony and evidence conflict on the nature of the incident and the justification of Barron's use of force.  Therefore, given the conflicting evidence and after consideration of the relevant factors in the context of the facts and circumstances of this case, the Court concludes there is a genuine issue of fact whether the force Barron used was objectively unreasonable.  *See Hall v. Bennett*, 447 F. App'x 921, 924 (11th Cir. 2011) (concluding summary judgment was inappropriate where the evidence left the court "with two competing, contradictory stories of what happened" and criticizing the district court for "improperly weigh[ing] the witnesses' credibility by favoring" the defendant's account over the plaintiff's).

### 3. Whether the law was clearly established that Barron's conduct was unlawful

It is undisputed that Barron was acting within his discretionary authority, and the Court has concluded that a reasonable jury could find that Barron violated Horn's constitutional rights by using excessive force.  Thus, Barron is entitled to qualified immunity only if the law was not clearly established that his conduct was unlawful.

Barron argues that "[n]o clearly established law gave Defendants fair warning that taking [Horn] to the ground when she pulled away from … Barron while he was attempting to handcuff her might constitute excessive force."  (Doc. 28-2 at 23).  "In determining whether a right is clearly established, '[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Hadley*, 526 F.3d at 1330, 1333 (alterations in original) (citation omitted).  At the time of the events in this case, the law was clearly established that a non-resisting and otherwise compliant arrestee has a "right to be free from excessive force."  *Id.* at 1333-34 (collecting cases); *see also Fils*, 647 F.3d at 1289 ("[U]nprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment."); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (concluding, without case law on point, that the defendants were not entitled to qualified immunity because the evidence, if believed, suggested "the officers used excessive force in beating [the plaintiff] even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way").

Therefore, if a jury credits Horn's version that Barron threw her to the ground so hard that her arm broke, even though she was non-resistant to his efforts to arrest her,

then no reasonable officers in Barron's position could have believed that his use of force was lawful. *See Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs*, 456 F. App'x 845, 849 (11th Cir. 2012) ("Given that [the plaintiff's] evidence, if credited, established a [constitutional] violation, [d]efendants ... are not entitled to qualified immunity at the summary judgment stage .... When considering qualified immunity at summary judgment, [district courts] are required to view the facts in the light most favorable to [the plaintiff] and draw all reasonable inferences from those facts in her favor.") (citing *Skop*, 485 F.3d at 1136). Accordingly, Barron is not entitled to qualified immunity.

## H.   State-law Claims

### 1.   Sovereign immunity

Macon-Bibb County contends it is entitled to sovereign immunity on the state-law claims against it for negligent hiring, training, supervision, and retention because Horn has failed to demonstrate Macon-Bibb County waived its sovereign immunity. In Georgia, sovereign immunity extends "to the state and all of its departments and agencies, including sheriffs and counties." *Richardson v. Quitman Cty., Ga.*, 912 F. Supp. 2d 1354, 1368 (M.D. Ga. 2012) (internal quotation marks and citation omitted). "Sovereign immunity is not an affirmative defense … that must be established by the party seeking its protection. Instead, immunity from suit is a privilege that is subject to waiver by the State, and the waiver must be established by the party seeking to benefit from the waiver." *Forsyth Cty. v. Greer*, 211 Ga. App. 444, 446, 439 S.E.2d 679, 681 (1993) (internal quotation marks and citation omitted) (alteration in original). Thus, unless Horn has established that sovereign immunity has been waived, sovereign

immunity bars these claims against Macon-Bibb County.  *See Seay v. Cleveland*, 270 Ga. 64, 65, 508 S.E.2d 159, 161 (1998).

"In Georgia, sovereign immunity may be waived only if a statute expressly provides that sovereign immunity is waived and the extent of such waiver."  *Grech*, 335 F.3d at 1341.  A municipality may waive its immunity by purchasing liability insurance but only if "the policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy."  O.G.C.A. § 36-33-1(a); *see also Kitchen v. CSX Transp., Inc.*, 6 F.3d 727, 731 (11th Cir. 1993) ("[W]hen the plain terms of the county's insurance policy provide that there is no coverage for a particular claim, the policy does not create a waiver of sovereign immunity as to that claim.").

Here, Horn confusingly argues Bray, Taylor, and Barron are not entitled to sovereign immunity, even though there is no indication or argument she has sued these Defendants in their official capacities.  (Doc. 49 at 27).  Horn has wholly failed to address whether sovereign immunity bars the state-law claims against Macon-Bibb County or produce evidence demonstrating Macon-Bibb County has waived its sovereign immunity.  (Docs. 33-3 ¶ 19; 36-1 ¶ 19).  Accordingly, Macon-Bibb County is entitled to summary judgment on the state-law claims against it.

### 2. **Official immunity**

Bray, Taylor, and Barron argue they are entitled to official immunity on Horn's state-law claims against them for false arrest, false imprisonment, assault, and battery. (Doc. 28-2 at 25).  "Under Georgia law, county law enforcement officers are entitled to official immunity from suit and liability unless they '... act with actual malice or an intent

to injure when performing a discretionary act.'" *Speight v. Griggs*, 579 F. App'x 757, 759 (11th Cir. 2014) (quoting *Roper v. Greenway*, 294 Ga. 112, 113, 751 S.E.2d 351, 352 (2013)), and citing Ga. Const. art. I, § 2, para. IX(d); *Phillips v. Hanse*, 281 Ga. 133, 135, 637 S.E.2d 11, 13 (2006). In the context of official immunity, "actual malice requires more than harboring bad feelings about another," *Adams v. Hazelwood*, 271 Ga. 414, 415, 520 S.E.2d 896, 898 (1999), and it does not include "implied malice," that is, "the reckless disregard for the rights or safety of others," *Murphy v. Bajjani*, 282 Ga. 197, 203, 647 S.E.2d 54, 60 (2007). It refers instead to "a deliberate intention to commit a wrongful or illegal act," *Tittle v. Corso*, 256 Ga. App. 859, 862, 569 S.E.2d 873, 876 (2002), which "may be accomplished with or without ill will and whether or not injury was intended," *Adams*, 271 Ga. at 415, 520 S.E.2d at 898. "A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." *Selvy v. Morrison*, 292 Ga. App. 702, 704, 665 S.E.2d 401, 401 (2008).

Bray, Taylor, and Barron argue they are entitled to official immunity because there is no evidence of "a wicked or evil motive on the part of the officers." (Doc. 28-2 at 28). *See Four Parcels of Real Prop.*, 941 F.2d at 1437-38 ("[T]he moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" (second and third alterations in original) (citation omitted)). Horn does not point to evidence or argue they acted with actual malice. The Court's own review of the evidence revealed none that would create a genuine issue of fact. As discussed, Horn only contends that these Defendants are not entitled to sovereign immunity; she makes no mention of official immunity.

Therefore, the Court concludes that the Defendants satisfied their burden of showing there is no genuine issue of fact whether they acted with actual malice, and Horn failed to rebut this showing to survive judgment.  Accordingly, Bray, Taylor, and Barron are entitled to official immunity on the state-law claims against them.

### III.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED in part** as to the § 1983 claims against the Macon Police Department and Macon-Bibb County; the § 1983 unlawful arrest claims and First Amendment retaliation claims against Bray, Taylor, and Barron; the § 1983 excessive force claims against Bray and Taylor; and the state-law claims against all Defendants.  The Defendants' motion for summary judgment is **DENIED in part** as to the § 1983 excessive force claim against Barron.

**SO ORDERED**, this the 26th day of August, 2016.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT